JUDGE KARAS

07 CV 4010

MARK K. SCHONFELD (MS-2798)
Regional Director

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center
Room 400
New York, New York  10281-1022
Telephone No.: (212) 336-1020
Fax No.: (212) 336-1323

MAY 2 3 2007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                   Plaintiff,

                  v.

THE BISYS GROUP, INC.,

                   Defendant.

07 Civ. ____ (____)

**COMPLAINT**

---

Plaintiff Securities and Exchange Commission, for its complaint against defendant The BISYS Group, Inc., alleges as follows:

## PRELIMINARY STATEMENT

1.    This action arises out of widespread improper accounting practices at BISYS, a leading provider of financial products and support services. As a result of these practices, BISYS's reported income for fiscal years 2001 through 2003 was overstated by approximately $180 million. The improper accounting practices were primarily based in the company's Insurance Services division, but also occurred in other divisions.

2.      From July 2000 through December 2003, BISYS engaged in a variety of improper accounting practices in its Insurance Services division that overstated BISYS's reported pre-tax income by roughly $118 million for the fiscal years ended June 30, 2001, 2002, and 2003, and by 34.3%, 38.9%, and 20.6%, respectively, in each of those fiscal years. The improper accounting practices in BISYS's other divisions overstated the company's pre-tax income by an additional $60.9 million over the same period.

3.      These improper accounting practices were the product of a corporate focus on meeting aggressive, short-term earnings targets and a lax internal control environment. Throughout the relevant period, Insurance Services was a major factor in the company's success in achieving those targets. The division's finance department responded to the corporate focus on making numbers by engaging in improper accounting practices.

4.      As a result of these improper accounting practices, which were knowingly or recklessly perpetrated by former BISYS officers and employees, the company's books and records were not accurate and its publicly filed financial statements did not did not comply with Generally Accepted Accounting Principles (GAAP). Without these improper accounting practices, BISYS's reported earnings would have fallen short of Wall Street expectations.

5.      BISYS's internal controls were not sufficient to provide reasonable assurance that the company's books and records were accurate or that its financial statements complied with GAAP. Although Insurance Services had grown rapidly through a series of acquisitions, the company failed to adopt and implement adequate controls over the accounting and financial reporting function of the acquired companies as they were integrated. The company lacked adequate controls for reconciling account balances or tracking receivables and lacked controls adequate to ensure that the assumptions used in estimating revenue were valid.

6.     With respect to Insurance Services, among other things, BISYS: (a) improperly recorded as its own revenue commissions earned by companies acquired by BISYS before they were acquired; (b) failed adequately to reserve against a substantial aging receivable balance; (c) improperly accounted for renewal and bonus commissions; and (d) made other improper accounting entries that overstated revenue or reduced expenses.

7.     With respect to other divisions, among other things, BISYS: (a) improperly recognized revenue from multi-year service contracts; (b) made improper entries in merger accrual accounts in connection with acquisitions; (c) improperly accounted for leases; and (d) improperly accounted for a rebate from a vendor.

8.     As a result of these improper accounting practices, BISYS filed annual and quarterly reports with the Commission that included financial statements that were materially inaccurate and misleading. In addition, the company's overstated financial results were incorporated in annual reports to shareholders, press releases, and offering documents including registration statements.

9.     On April 22, 2004, BISYS announced that it would take a charge for the quarter ended March 31, 2004 of $24.7 million to write off commissions receivable in its Insurance Services division. Following the announcement, the closing price of BISYS's common stock on April 22, 2004 was $13.69, representing a decline of $1.89, or 12.1%, from the previous day's closing price of $15.58.

10.     After the close of trading on May 17, 2004, BISYS announced: (a) the previously disclosed write-off of $24.7 million in receivables was then estimated to be approximately $70-80 million; (b) the company would restate previously issued financial statements; and (c) the company was unable to file its March 31, 2004 10Q, which was due that day. On May 18, 2004,

BISYS announced that the write-off of commissions receivable was then estimated to be approximate $72 million. The closing price of BISYS's common stock on May 18, 2004 was $12.97, representing a drop of $1.13, or 8.0%, from the previous day's closing price of $14.10. The total decline in the price of BISYS stock from the close of trading on April 21, 2004, the day before the first announcement of any write-off related to commissions receivable, until the close of trading on May 18, 2004, was $2.61, or 16.8%.

11.    On June 16, 2004, BISYS announced that it would restate its previously reported financial results for the fiscal years ended June 30, 2001, 2002 and 2003, and for the quarters ended September 30 and December 31, 2003, to reduce revenue by approximately $100 million as a result of improper acquisition accounting and improper accounting for commissions receivable in the Insurance Services division. The company ultimately issued two restatements, filing a $103.7 million restatement in August 2004 and a second restatement of $108.7 million in April 2006.

12.    As a result of the foregoing conduct, BISYS, directly and indirectly, has engaged, and may again engage, in violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder.

## JURISDICTION

13.    The Commission brings this action pursuant to the authority conferred upon it by Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d)(1), and seeks to restrain and enjoin the defendant from engaging in the acts and practices alleged herein. The Commission also seeks an order requiring BISYS to disgorge the ill-gotten gains received as a result of its violative

4

conduct, plus prejudgment interest and such other and further relief as the Court deems appropriate.

14.    This Court has subject matter jurisdiction over this action pursuant to Sections 21(d)(2), 21(d)(5), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d)(2), 78u(d)(5),78u(e), and 78aa.

15.    BISYS, directly and indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange, in connection with the acts, practices, and courses of business alleged in this complaint.

## THE DEFENDANT

16.    **BISYS** is a publicly-held Delaware corporation with its principal executive office in Roseland, New Jersey.  During the relevant period the company was headquartered in New York, New York.  BISYS's securities are registered pursuant to Section 12(b) of the Exchange Act.  BISYS's common stock trades on the New York Stock Exchange.  BISYS's fiscal year ends on June 30th.  The improper accounting acts and practices by BISYS described in this Complaint were perpetrated by former BISYS officers and employees.

## BACKGROUND

17.    During the relevant period, directly and through wholly-owned subsidiaries, BISYS provided products and support services to financial institutions such as insurance companies, banks and mutual funds.  At the time, BISYS was divided into three business groups: (1) Insurance and Education Services; (2) Investment Services; and (3) Information Services.

18.    During the relevant period, Insurance and Education Services was comprised of the Insurance Services division and the Education Services division.  Through the Insurance Services division, BISYS was and is the nation's largest independent distributor of life

insurance. It acts as an insurance broker and provides support services to brokers who sell term, fixed and variable life, long-term care, disability and annuity products.

19.    The Investment Services group provided administration and distribution services for mutual fund complexes, hedge funds and private equity funds, and provided retirement plan services to mid-size plans. The Information Services group provided banks, insurance companies and other firms with information processing and check imaging solutions.

20.    During the relevant period, Insurance Services' management and finance department were located in Harrisburg, Pennsylvania, and BISYS's corporate finance department, except for its chief financial officer, was located in Columbus, Ohio. The chief financial officer was located at the company's headquarters in New York.

<h3 align="center">BISYS'S RAPID GROWTH THROUGH<br>ACQUISITIONS IN INSURANCE SERVICES</h3>

21.    From 2000 through 2003, BISYS consistently reported profits and touted its "record revenue" in earnings releases. This growth was driven in large part by an aggressive acquisition strategy, primarily in Insurance Services, which the company touted as its "fastest growing and highest margin business." Insurance Services' revenues increased as a percentage of BISYS's total reported revenues from 15.7% in the fiscal year ended June 30, 2000 ("fiscal 2000") to 25.5% in the fiscal year ended June 30, 2003 ("fiscal 2003").

22.    In fact, however, a material portion of Insurance Services' growth was illusory, and the result of clear deviations from GAAP, including improper acquisition accounting, the failure to reserve properly against uncollectible accounts receivable, improper accounting for renewal and bonus commissions, and a variety of unsupported accounting entries that enabled BISYS to meet Wall Street expectations.

## THE IMPROPER ACQUISITION ACCOUNTING

23.    From July 2000 through June 2003, Insurance Services acquired twelve insurance brokerage companies. These acquisitions contributed substantially to BISYS's overall growth, accounting for approximately $86 million of the company's total revenue growth during the period of $387 million. A material portion of this growth from acquisitions was the result of the use of an improper accounting methodology that enabled BISYS to book income it had not earned but rather that had been earned by the acquired companies before the acquisition.

24.    With a few exceptions, the acquired companies used cash basis accounting. This meant that under GAAP, BISYS was required to record the acquired company's commissions receivable on the acquired company's balance sheet at the time of acquisition by estimating the amount still to be received for policies sold prior to the acquisition. Under GAAP, these commissions did not constitute revenue to BISYS.

25.    However, contrary to GAAP, BISYS recorded the commissions previously earned by the acquired company, but not yet paid, as its own revenue. For ten acquisitions (of companies using cash basis accounting), BISYS recorded all of the acquired company's previously-earned commissions as BISYS's revenue in periods after the acquisition and recorded none of those commission receivables on the opening balance sheets of the acquired companies. For two other acquisitions (of companies using accrual basis accounting), BISYS recorded some of the acquired company's previously-earned commissions as BISYS's own revenue, and under-recorded commissions receivable on the opening balance sheet of the acquired company.

26.    The practice of recording as BISYS's own revenue, commissions earned by the acquired companies prior to the acquisition was well known within the company. The practice was reflected in numerous documents circulated to former members of senior management,

7

including due diligence reports, management reports and monthly preliminary analyses of financial results that showed that BISYS made significant revenue entries immediately after acquisitions.

27.    Within the company, the revenue improperly recorded in connection with Insurance Services' acquisitions was referred to as "cash to accrual pick-ups."

28.    Not only was the practice inconsistent with GAAP, but it was contrary to BISYS's own revenue recognition policy.  According to that policy, "revenue recognition occurs at the moment the client accepts the policy," which in the case of policies sold by acquired companies occurred before the acquisition.

29.    BISYS's improper acquisition accounting resulted in the material overstatement of BISYS's income for fiscal years 2001, 2002, and 2003.  By improperly accounting for the income earned by the companies it acquired, BISYS improperly recognized revenue of $7,214,000 in fiscal 2001, $7,745,000 in fiscal 2002, and $7,451,000 in fiscal 2003, overstating pre-tax income in each of those years by 6.9%, 5.7% and 5.1%, respectively.

30.    In many instances, BISYS's accounting for acquisitions was the difference between missing or meeting earnings targets.  For example, as a result of the company's accounting for its acquisition of Harrison James in May 2002, reported earnings per share ("EPS") was overstated by $0.01 for the quarter and year ended June 30, 2002, just matching analysts' expectations.

31.    One significant example of BISYS's improper acquisition accounting was its accounting for commission revenue earned by Ascensus Insurance Services, which BISYS acquired on July 31, 2000.  Ascensus employed accrual accounting and thus had already recorded previously earned commissions as receivables on its own books.  While performing due

diligence for the acquisition, BISYS learned that Ascensus had earned but failed to record on its

books over $4 million of bonus commission revenue for fiscal 1999 and 2000. (Bonus

commissions are additional commissions on the sale of insurance, based on the insurance brokers

having reached certain sales targets.) BISYS did not record this additional receivable as an asset

on Ascensus' balance sheet at the time of the acquisition, as required by GAAP. Instead, after

the acquisition, over a period of several months BISYS booked millions of dollars of Ascensus's

unrecorded bonus revenue as its own.

32.     As a result of its improper accounting for the Ascensus under-booked bonus,

BISYS improperly recorded $3.2 million in revenue for the quarter ended September 30, 2000,

and thus overstated its income before taxes by approximately 18%. In addition, the company

was able to report EPS of $0.22, exceeding analysts' expectations (excluding merger charges) by

$0.01. Without the revenue attributable to the Ascensus under-booked bonus, EPS would have

been $0.19 and fallen short of analysts' expectations.

## THE FAILURE ADEQUATELY TO RESERVE FOR AGING RECEIVABLES

### Background – BISYS's Accounting for Insurance Commission Receivables

33.     Insurance Services' primary source of revenue was commissions earned on the

sale of life insurance products. BISYS received insurance commissions from insurance carriers,

generally net of any commissions due the selling agent. The company recorded commission

revenue when the policies were placed or renewed. Although premiums were paid annually,

semi-annually, quarterly, or monthly, BISYS immediately recorded the total commission due on

the full year's premium even though it collected the receivable only as the policy holder made

premium payments. BISYS earned three types of insurance commissions: first-year

commissions, renewal commissions and bonus commissions.

34.    First-year commissions are commissions earned on the initial sale of insurance policies. In January 2001, BISYS began to implement a point-of-sale ("POS") system that allowed the recording of first-year commissions on a policy-by-policy basis. As BISYS acquired companies, it would transition them to the BISYS POS system. However, there was a time lag between acquisition and integration into the POS system. In this lag period, acquired companies would book receivables for first-year commissions separately, and these "non-POS" receivables were organized on BISYS's books by acquired company. Unlike the POS system, which had detailed sub-ledgers identifying each policy upon which a commission was due, the non-POS receivables generally were not supported by such detailed information.

35.    Renewal commissions were commissions earned on policies renewed in the second year and thereafter, and were substantially smaller than first-year commissions. BISYS had much less information on the renewal of policies than it did on the initial sale because renewals generally occurred directly between the policy holder and the carrier. BISYS received monthly checks from carriers with statements indicating the policies for which renewal commissions were being paid. Rather than recording these commissions on a cash basis as payments were received from carriers, BISYS estimated its renewal commissions and recorded a corresponding receivable. This estimate was then adjusted quarterly, based on historical net cash receipts.

36.    In addition to first-year and renewal commissions, BISYS received a variety of bonus commissions. The majority of the bonus commissions were additional commissions based on total business for the year. The bonus rate, which could be calculated either as a percentage of the premium or of the first year commission rate, increased during the year as production thresholds – generally either placed or paid premiums – were reached. For example, the carrier

might pay a 25% bonus if production exceeded $10 million in premiums and increase the rate to 30% if production exceeded $20 million. The increase to 30% would be retroactively paid so all production would receive the 30% rate. BISYS's policy was to estimate the bonus commissions based on prior history and adjust quarterly for current production.

### The Failure to Adequately Reserve for the Aging Non-POS Balance

37.    By the time of fiscal 2003 audit, a large commission receivable balance in Insurance Services was old and lacked adequate support. As of June 30, 2003, the non-POS receivable balance was $33.6 million, of which more than $23 million, or 69%, was attributable to first-year commission receivables that were over a year old. This non-POS balance represented roughly 25% of Insurance Services' total accounts receivable balance of $130 million. The old and uncollectible non-POS receivables ultimately accounted for $23.2 million of the approximately $122 million restatement for Insurance Services.

38.    The only support for many of the non-POS receivables was a roll-forward schedule that showed an ending balance for the month for each acquired company. BISYS maintained no documentation to support those ending balances, which were based on estimates. Accordingly, it was not possible to compare the amounts supposedly owed by each carrier with data substantiating or detailing the receivable.

39.    Company officials were aware of the age, size, and lack of documentation for these receivables. For example:

a.    By the time of the fiscal 2003 audit, analyses by Insurance Division finance staff indicated that at least $15.9 million of the non-POS balance was probably uncollectible and that anywhere from $1.6 million to $4 million of POS receivables were uncollectible, including receivables associated with policies that had lapsed or not been taken out.

b.    In addition, BISYS had established a committee to monitor balance sheet accounts throughout the company – the "Reconciliation Review Committee." The committee included the former corporate controller, among others, and met at roughly six-month intervals, beginning in April 2002. At each of these meetings, the committee noted that "reconciliations for AR-Commissions on most [acquired insurance brokerage] companies are inadequate to support general ledger balances. Presently they consist of a roll forward of monthly activity with no proof of ending balance." The roll-forward schedules reflected very little cash received in the accounts receivable.

c.    By the end of fiscal 2003, former company officials had decided that BISYS would write off between $7 and $8 million of Insurance Services' receivables the following fiscal year rather than in the current year.

40.    Notwithstanding all these indications that a substantial portion of Insurance Services' non-POS and other receivables was probably uncollectible, at June 30, 2003, BISYS established a reserve of only $4.99 million for all of Insurance Services' receivables, which totaled over $130 million. Only $3 million of the $4.99 million reserve was attributable to non-POS receivables.

41.    This reserve was inadequate. Former BISYS officers were aware that the reserve for non-POS receivables was understated by at least $12.9 million. In fact, the reserve for non-POS receivables subsequently proved to be understated by approximately $23 million when BISYS reported its financial results for the fiscal year ended June 30, 2003. When the company restated, it wrote off $23 million of non-POS receivables as uncollectible, after having established a reserve for non-POS receivables of only $3 million.

## IMPROPER ACCOUNTING FOR RENEWAL COMMISSIONS

42.    BISYS also improperly accounted for renewal commissions by using unsupported and excessive estimates to accrue for those commissions. BISYS accrued for renewal commissions on the basis of an estimate because it elected to account for renewal commission revenue on an accrual, as opposed to cash, basis and because the company's information systems did not allow it to track when policies were renewed. It was the company's policy to calculate the estimate by applying a formula to its incoming cash flow for renewal commissions, and to adjust the receivable quarterly, based on historical cash receipts, net of amounts owing to the agents ("net cash receipts" or "trailing cash flow").

43.    In fiscal 2001, the company began to record a renewal receivable equal to six months' trailing cash flow, which represented an increase over prior periods.

44.    BISYS had no reasonable basis for the decision to record a renewal receivable equal to six months' trailing cash flow during the relevant period. The company failed to document its basis for the use of six-month trailing cash flow metric or the reason for the increase. Until it restated, the company took no steps to verify that the use of any period of trailing cash flow was appropriate and had no internal controls in place to ensure that its estimates were reasonable. When it restated, BISYS concluded that it should have estimated renewal receivables using no more that 2.9 months of trailing cash flow.

45.    As a result of its use of the inflated renewal estimates, BISYS overstated revenue by $4.5 million in fiscal 2001, $7.8 million in fiscal 2002, and $0.7 million in fiscal 2003. In addition, when it restated, BISYS wrote off $14.2 million in renewal commission receivables on its balance sheet as of June 30, 2003, representing 65% of the $21.6 million renewal receivable balance for Insurance Services as of that date.

46.    The use of the inflated renewal estimates allowed the company to meet Wall Street expectations. BISYS reported EPS of $1.45 for fiscal 2001, excluding restructuring charges, matching analysts' mean and median estimates. Without the overstated renewal commission revenue, the company would have reported EPS of $1.41, missing expectations by $0.04. For fiscal 2002, BISYS reported EPS of $0.97, excluding restructuring charges, matching analysts' mean and median estimates. Without the overstated renewal revenue from the incorrect estimate, BISYS would have reported EPS of $0.93, missing expectations by $0.04.

## IMPROPER ACCOUNTING FOR BONUS COMMISSIONS

47.    BISYS' accounting for bonus commissions also failed to comply with GAAP, resulting in the overstatement of the company's bonus commission revenue by a total of $26.3 million for the 2001, 2003, and 2003 fiscal years. The accounting was improper because it was based on estimates for which the company had no reasonable basis or, in some instances, was simply increased at the end of the quarter to increase earnings.

48.    The bonus commission rate increased during the year as production thresholds – generally calculated on the basis of either the amount of premiums due for policies sold or the amount of premiums actually paid – were reached. It was BISYS's policy to accrue bonus commissions using the bonus rate it expected to reach by the end of the year, rather than the rate then in effect. Because the company did not adequately monitor the bonus commissions due from each carrier, however, it lacked a reasonable basis for its estimate. Beginning in fiscal 2002, BISYS recorded an allowance against the bonus receivable designed to account for the possibility that it would not reach all of the thresholds. However, the allowance was insufficient because the company did not adequately monitor the recoverability of its bonus receivables.

49.    In addition, at the end of certain fiscal quarters, division finance department staff were directed by former company employees to increase the bonus receivable in amounts that were not based on any supportable rationale but rather were designed to increase earnings.

50.    As a result of the improper accrual estimates, BISYS overstated bonus revenue by $9.3 million in fiscal 2001, $12.4 million in fiscal 2002 and $4.6 million in fiscal 2003. In addition, when it restated, the company wrote off $28.7 million in bonus commission receivables, representing 76% of the company's $38 million bonus receivable balance as of June 30, 2003.

### ADDITIONAL IMPROPER ACCOUNTING ENTRIES IN INSURANCE SERVICES

51.    To meet quarterly earnings targets, BISYS made additional improper accounting entries that overstated Insurance Services' income or revenue for the quarter. These entries affected BISYS's reported results for the quarters ended December 31, 2000, December 31, 2001, and for the quarter and year ended June 30, 2002, and resulted in the overstatement of BISYS's revenue by a total of approximately $13.6 million in the affected periods. Some examples of these income or revenue boosting entries are as follows:

a.    BISYS booked unsupported revenue entries with offsetting expense accruals towards the end of the quarter, and reversed the entries after the end of the quarter. These unsupported entries were created for the sole purpose of increasing revenue in an effort to meet BISYS's – and analysts' – revenue projections.

b.    BISYS inflated its results by increasing the rate at which Insurance Services accrued commissions on the sale of so-called "419 plans" – insurance products designed to qualify for tax benefits under Sections 419 and 419A of the Internal Revenue Code. These increases were not based on any analysis and were inconsistent with the historical

trend of the carriers' business, resulting in an overstatement of BISYS's pre-tax earnings that allowed the company to exceed analysts' expectations.

c.      BISYS also overstated renewal commission receivables and revenue by improperly accounting for cash advances received on renewal commissions. BISYS collected cash for renewal commission receivables, but promised to repay the amount received, either in cash or as a reduction in future commissions owed to BISYS. Instead of reducing the renewal commission receivables for the cash advance or establishing a liability to reflect the obligation to repay it, BISYS improperly recorded the advance as revenue without reducing the receivable, thereby inflating revenue and income and allowing the company to meet analysts' expectations.

## IMPROPER ACCOUNTING IN OTHER DIVISIONS

52.      BISYS engaged in improper accounting practices with respect to divisions other than Insurance Services, resulting in $90.2 million of adjustments in the second restatement. The bulk of those adjustments – approximately $68.4 million or 76% – were for the Fund Services and Retirement Services divisions of the Investment Services group and the Banking Solutions division of the Information Services group. The adjustments were primarily to correct for improper revenue recognition for multi-year service contracts, improper use of merger accruals in acquisitions, improper lease accounting, and improper accounting for a rebate from a vendor.

## BISYS'S MISSTATED FINANCIAL RESULTS

53.      As a result of these improper accounting practices, BISYS filed annual and quarterly reports with the Commission that materially misstated its results for the years ended June 30, 2001, 2002, and 2003, the interim quarters during each of those fiscal years, and the quarters ended September 30, and December 31, 2003. These misstated results were also

reflected in annual reports to shareholder, press releases, private offering memoranda, registration statements the company filed in connection with its issuance of convertible notes, and offering documents for stock and options issued in connection with acquisitions.

54.     In March 2001, BISYS raised approximately $300 million through a convertible note offering. In addition, on seven occasions, from September 30, 2000 through December 31, 2003, the company issued stock or options for cash, or in connection with acquisitions, on the basis of its inflated stock price. As a result of these transactions, BISYS obtained approximately $19,691,000 in ill-gotten gains.

55.     On June 16, 2004, BISYS announced that it would restate its previously reported financial results for the 2001, 2002 and 2003 fiscal years, and for the quarters ended September 30, 2003 and December 31, 2003 to reduce commissions receivable in the Insurance Services division by $80 million, to reduce revenue by an additional $21 million in connection with certain acquisitions, and to make other adjustments.

56.     On August 10, 2004, BISYS filed the restatement in a Form 10-K/A and two Forms 10-Q/A (the "First Restatement"). In total, the First Restatement included approximately $103.7 million of adjustments, of which $95.2 million pertained to fiscal years 2001 through 2003. (The remaining $8.5 million consisted of a $10.6 million write-off of receivables pertaining to the period before July 1, 2000, offset by a $2.1 million increase in commission income for the six months ended December 31, 2003.) The First Restatement concerned only Insurance Services.

57.     On April 26, 2006, BISYS filed its Form 10-K for fiscal year 2005 and further restated its previously reported financial results for the fiscal years ended June 30, 2003 and 2004 (the "Second Restatement"). The Second Restatement affected nearly every division of the

17

company, further reducing cumulative pre-tax income for fiscal years 2001 through 2003 by

$84.2 million, offset slightly by an increase to pre-tax income of $5.8 million in fiscal year 2004

for a cumulative pre-tax effect of $78.4 million through June 30, 2004. The six months ended

December 31, 2004 were also restated, increasing pre-tax income by $7.0 million for a total

impact of $71.4 million, or 10.5 % of originally reported pre-tax income, through December 31,

2004. An additional $37.3 million of pre-tax income from periods prior to fiscal 2001 was also

written off. The Second Restatement included an additional $23.3 million of items in Insurance

Services for fiscal years 2001 through 2003.

    58.    Based on the restatements, the quantitative impact of BISYS's improper

accounting on the company's reported results for the 2001 through 2003 fiscal years is as

follows:

**Impact of Restatements**
**(in thousands, except EPS)**

| | FY 2001 | | FY 2002 | | FY 2003 | | Total |
|---|---|---|---|---|---|---|---|
| **Income before taxes, as originally reported:** | $ | 140,694 | $ | 187,849 | $ | 175,295 | $ | 503,838 |
| **Income before taxes, as restated:** | | 83,466 | | 118,682 | | 122,342 | | 324,490 |
| **Restatement amount** | $ | 57,228 | $ | 69,167 | $ | 52,953 | $ | 179,348 |
| **Percentage by which income before taxes was overstated** | | 69% | | 58% | | 43% | | 55% |
| **Net income, as originally reported:** | $ | 85,120 | $ | 115,861 | $ | 111,823 | $ | 312,804 |
| **Net income, as restated** | | 49,742 | | 72,445 | | 77,284 | | 199,471 |
| **Restatement amount** | $ | 35,378 | $ | 43,416 | | 34,539 | $ | 113,333 |
| **Percentage by which net income was overstated** | | 71% | | 60% | | 45% | | 57% |
| **EPS, as originally reported:** | $ | 0.71 | $ | 0.94 | $ | 0.92 | $ | 2.57 |
| **EPS, as restated** | $ | 0.41 | $ | 0.58 | $ | 0.63 | $ | 1.62 |
| **Restatement amount** | $ | 0.30 | $ | 0.36 | $ | 0.29 | $ | 0.95 |
| **Percentage by which EPS was overstated** | | 73% | | 62% | | 46% | | 59% |

## FIRST CLAIM FOR RELIEF

(Violations of Section 13(a) of the Exchange Act and Rules 12b-20,
13a-1, 13a-11, and 13a-13)

59.    The Commission realleges and incorporates by reference herein each and every
allegation contained in paragraphs 1 through 58, above.

60.    As described above, BISYS failed to file with the Commission such financial
reports as the Commission has prescribed, and failed to include, in addition to the information
expressly required to be stated in such reports, such further material information as was
necessary to make the statements made therein, in light of the circumstances in which they were
made, not misleading.

61.    By reason of the foregoing, BISYS violated, and unless enjoined, will continue to
violate, Section 13(a) of the Exchange Act, 15 U.S.C. § 78m(a), and Rules 12b-20, 13a-1, 13a-
11, and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a.1, 240.13a-11, and 240.13a.

## SECOND CLAIM FOR RELIEF

(Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act)

62.    The Commission realleges and incorporates by reference herein each and every
allegation contained in paragraphs 1 through 61, above.

63.    As described above, BISYS failed to make and keep books, records, and accounts
which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of its
assets, and failed to maintain a system of internal accounting controls that permit the preparation
of financial statements in conformity with GAAP.

64.    By reason of the foregoing, BISYS violated, and unless enjoined, will continue to
violate, Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, 15 U.S.C. §§ 78m(b)(2)(A)
and 78m(b)(2)(B).

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

1.      Enter a Final Judgment:

a.      permanently restraining and enjoining defendant BISYS, its officers,

agents, servants, employees, attorneys, and all persons in active concert or participation with

them who receive actual notice of the injunction by personal service or otherwise, and each of

them, from, directly or indirectly, violating Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the

Exchange Act, 15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and (B), and Rules 12b-20, 13a-1, 13a-11

and 13a-13 thereunder, 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13; and

b.      directing defendant BISYS to disgorge its ill-gotten gains from the

conduct alleged in this Complaint, together with prejudgment interest thereon; and

2.      Grant such other and further relief as the Court deems appropriate.


Dated:  May 23, 2007
New York, New York


                                        Respectfully Submitted,

                                        Mark K. Schonfeld (MS-2798)
                                        Regional Director

                                        Attorney for Plaintiff
                                        U.S. Securities and Exchange Commission
                                        New York Regional Office
                                        3 World Financial Center
                                        Room 400
                                        New York, NY  10281-1022
                                        Tel. (212) 336-1020


Of Counsel:     Andrew M. Calamari
                Leslie Kazon
                Paul W. Ryan
                Kristine M. Zaleskas